UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 37 BESEN PARKWAY, LLC, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.),<br><br>Defendant. | Civil Action No. 15-cv-9924<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff 37 Besen Parkway, LLC ("plaintiff"), and on behalf of itself and all others similarly situated, for its Complaint against defendant John Hancock Life Insurance Company (U.S.A.) ("John Hancock"), states as follows:

**NATURE OF THE ACTION**

1. This is a class action brought on behalf of plaintiff and similarly situated owners of life insurance policies issued by John Hancock. Plaintiff seeks to represent two classes of injured John Hancock policyholders: (1) policyholders who have been forced to pay unlawful and excessive cost of insurance ("COI") charges by John Hancock, and (2) policyholders who have been charged unlawful and excessive premiums under an "Age 100 Waiver of Charges Rider."

A. **Cost of Insurance Overcharges**

2. The plaintiff, along with numerous other John Hancock policyholders, has been forced to pay inflated COI charges that are not allowed by the plain language of their insurance contracts. The subject John Hancock policies specify that monthly cost of insurance ("COI") rates "will be based on" expectations of future mortality experience – and nothing else. John Hancock also contractually promised to review those mortality-only based COI rates at least once every 5 policy years.

3. These policy provisions created a mutual and reciprocal commitment between John Hancock and all putative class members: policyholders agree to let John Hancock increase COI rates if expectations of future mortality experience get worse, and in return, John Hancock agrees to *decrease* COI rates on its customers when there is an improvement in mortality experience. John Hancock, however, has failed to live up to its end of the bargain.

4. Nationwide mortality rates have *declined* significantly over the past several decades. John Hancock's expectations of future mortality experience have likewise substantially changed in its favor. As a result, insureds are living longer than John Hancock originally anticipated when the policies at issue were first priced. That is one reason that John Hancock's parent company, reporting on behalf of John Hancock and others, has repeatedly stated in regulatory filings over the past 15 years that mortality experiences were substantially better than it expected. Despite this improved mortality experience, John Hancock has not lowered the COI rates it charges its customers.

5. The components – or, in the case of the John Hancock policies at issue here, the *sole* component – of what a COI rate can be "based on" is a critically important feature of universal life policies. The COI charge is typically the highest expense that a policyholder pays.

6. Universal and variable life policies combine death benefits with a savings or investment component, often known as the "account value." The COI charge is deducted outright from the policy owner's account value, so the policyholder forfeits the COI charge entirely to John Hancock. The COI charge represents John Hancock's risk – the chance that John Hancock will have to pay the death benefit (the policy's "face value") to the policy's owner when the insured dies. The payment of COI charges to cover John Hancock's risk is the policy's insurance component, and John Hancock contractually agreed to base its COI rate *only* on a mortality factor. The COI charge is deducted on a monthly basis, and it is calculated by multiplying the applicable "COI rate" by the net amount at risk that John Hancock stands to pay out when the insured dies (i.e., the difference between the face value and the account value).

7. The subject policies here each state that the COI rates John Hancock charges "will be based on our expectations of future mortality experience." Counsel to the insurance industry has referred to this provision as a "*Single* Consideration Policy Form" because the *only* factor that the carrier can and must consider when reviewing COI rates is "expectations of future mortality experience." This provision requires John Hancock to *decrease* COI rates if it experiences an improvement in expected mortality. In other words, if John Hancock expects fewer people to die at a given rate than originally anticipated, then it will expect to pay out fewer death benefits at a given rate. And if John Hancock pays out fewer death benefits over time, then John Hancock's cost of providing life insurance goes down, and the COI rate should correspondingly decrease. Had the situation been reversed, so that future mortality experience had been worse for John Hancock than originally anticipated, John Hancock would have been contractually entitled to increase its COI rates.

8.  In the face of the substantially improved mortality experience that has benefited John Hancock, it is apparent that John Hancock has wrongly construed its policies as granting it a nonsensical "heads I win, tails you lose" power, reserving the right to *increase* COI rates if there were to be an unexpected pandemic that made mortality experience worse than anticipated, but not requiring it to *decrease* COI rates in the face of years and years of improved mortality experience—an improvement that has, in fact, already occurred.  John Hancock has also wrongly based COI rates on other factors besides just its expectations of future mortality experience.  This position obviously has no merit and breaches the terms of the insurance policies.  As a result of this misconduct, plaintiff seeks monetary relief for the COI overcharges that John Hancock has wrongly imposed on its customers.

    **B.**     **Age 100 Rider Overcharges**

9.  John Hancock has also charged plaintiff and other similarly situated policyholders unauthorized additional premiums under an Age 100 Waiver of Charges Rider ("Age 100 Rider") included in certain John Hancock life insurance policies.

10.  Under the Age 100 Rider, John Hancock relinquishes its right to collect premium payments after the insured reaches age 100, in exchange for the right to collect additional amounts as premium payments for a defined period of time on policies with younger insureds.  That is, the policy owner pays more when the insured is younger in order to pay less if and when the insured reaches age 100.

11.  Plaintiff's policy explicitly sets the additional premiums that John Hancock could charge and the period of time in which these additional premiums would need to be paid under the Age 100 Rider.

4

12. According to the policy, John Hancock could charge these additional premiums on the policies with the Age 100 Rider during the years in which the underlying insureds were 32 years old or younger. The policy did not provide for or permit John Hancock to charge any additional premium for the Age 100 Rider for insureds that were 33 years old and older.

13. Notwithstanding the plain language of the policy, John Hancock charged plaintiff additional premiums for the Age 100 Rider even though the insureds were older than 32 years old. This action therefore seeks monetary relief for these impermissible additional premiums charged by John Hancock and paid by plaintiff and other similarly situated policyholders.

## THE PARTIES

14. Plaintiff 37 Besen Parkway, LLC ("Besen") is a limited liability company organized and existing under the laws of New York, and its principal place of business is in Rockland County, New York. Plaintiff is the owner of a John Hancock joint universal life insurance policy number 54010426, insuring the lives of John and Jane Doe,[1] which was issued on or about June 1, 2000 by John Hancock Life Insurance Company and currently has a face value of $1.445 million (the "Doe Policy"). At issuance, John Doe was age 70 and Jane Doe was age 65. One of the insureds covered under the policy has already deceased. The Doe Policy remains in-force with John Hancock. The Doe Policy has not received any COI rate decrease since it was issued. The Doe Policy was issued on John Hancock Policy Form 96SURVUL, which on information and belief, was introduced in or around 1997.

15. Defendant John Hancock Life Insurance Company (U.S.A.) is a corporation organized and existing under the laws of Massachusetts, having its principal place of business in Boston, Massachusetts. An endorsement to the Doe Policy states that John Hancock's "statutory

---

[1] For privacy reasons, plaintiff has substituted "John and Jane Doe" for the names of the actual insureds.

5

home office" is in Bloomfield, Michigan. Upon information and belief, John Hancock Variable Life Insurance Company and John Hancock Life Insurance Company merged with and into John Hancock Life Insurance Company (U.S.A.) in 2009. The term "John Hancock" includes John Hancock Life Insurance Company (U.S.A.) and all its predecessors.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000. Upon information and belief, less than two-thirds of the members of the proposed classes in the aggregate are citizens of the State of New York. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

17. This Court has personal jurisdiction over John Hancock because John Hancock has confirmed that the owner of this policy is a New York entity and has collected premiums on this policy sent on behalf of the New York entity.

18. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because the events giving rise to plaintiff's causes of action occurred in this District, including John Hancock's COI rate overcharge and deduction of unauthorized additional premiums under the Age 100 Rider.

## FACTUAL BACKGROUND

### A. Cost of Insurance

19. The first set of policies at issue are individual universal life ("UL") policies (including variable universal life ("VUL")), and survivorship UL policies issued by John

6

Hancock that have the following language about how the rate used to calculate the COI charge – known as the "Applied Monthly Rates" – will be based and later reviewed:

> The Applied Monthly Rates will be based on our expectations of future mortality experience. They will be reviewed at least once every 5 Policy Years. Any change in Applied Monthly Rates will be made on a uniform basis for Insureds of the same sex, Issue Age, and Premium Class, including tobacco user status, and whose policies have been in force for the same length of time.

These policies include, but are not limited to, all policies issued on the policy form of the Doe Policy (i.e., Form 96SURVUL), all policies in the Doe Policy product line, and all policies issued on the following policy forms (and/or policy plans): Form 93-98 (Flexible Premium Variable Survivorship Life Insurance), Form 94-98 (Medallion – Flexible Premium Variable Life Insurance), MAJ498 (Majestic Variable Estate Protection), 96SURVUL (UL Estate Protection), 156-SURV-96, 96LTUL (Medallion Gold), 01MVL (Medallion Variable Universal Life Edge), 99VEP (Variable Estate Protection II), and Majestic UL. These policies are referred to as "COI Class Policies." A copy of the Doe Policy, redacted of personal information, is attached hereto as Exhibit A.

20.    The relevant terms of all COI Class Policies are substantively identical to those set forth in the Doe Policy. The policies at issue are all form policies, and insureds are not permitted to negotiate different terms. The COI Class Policies are all contracts of adhesion.

21.    This Applied Monthly Rate provision obligates John Hancock to review its COI rates at least once every five policy years, and provides that the *only* factor that the carrier can and must consider when reviewing COI rates are "expectations of future mortality experience." Nothing else. Because the COI rates on the COI Class Policies must be based solely on expectations of future mortality experience, COI rates must be adjusted whether those mortality experiences are improving or declining. By contrast, John Hancock has issued plenty of other

7

insurance policies that expressly provide it with the right to base its COI rates on factors other than solely mortality when that is its intention.[2]

22. The size of the COI charge matters to universal life policyholders for at least two important reasons: (a) the COI charge is typically the highest expense that a policyholder pays; and (b) the COI charge is deducted from the account value (i.e., the savings component) of the policy, so the policyholder forfeits the COI charge entirely to John Hancock (this is in contrast to the balance of premium payments, which, after expenses are deducted, are deposited into the account value and invested on behalf of the policyholder or credited with interest by the insurance company).

23. John Hancock has forced policyholders to pay excess COI charges by failing to adjust COI rates in the face of improving mortality, and the COI charges are in excess of what John Hancock is contractually permitted to charge to cover its mortality risks.

### B. Improving Mortality and John Hancock's Unlawful Failure to Base COI Rates Solely on Expectations of Future Mortality

24. John Hancock has not decreased its COI rates for COI Class Policies, despite the fact that mortality rates have improved steadily *each year* – i.e., mortality risks have only gotten *better* for John Hancock over time, as people are living much longer than anticipated when the products were priced and issued.

25. A mortality table is a chart showing the rate of death at a certain age. Rate of death can be measured as a percentage or in terms of the number of deaths per thousand. Separate tables are produced to reflect groups with different mortality. Mortality tables will

---

[2] *See, e.g.*, John Hancock Medallion Variable Universal Life Edge II, Policy Form 03MVLII ("The Applied Monthly Rates will be based on our expectations of future mortality, persistency, investment earnings, expense experience, capital/reserve requirements and/or tax assumptions and will never be greater than the Maximum Monthly Rates shown in Section 2."), *available at* http://www.sec.gov/Archives/edgar/data/317411/000119312510000119/dex9926d3.htm.

usually have separate tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status and duration since underwriting.  Mortality tables are used by actuaries to calculate insurance rates, and are designed to reflect mortality rate experience.

26. Beginning at least as early as 1980, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies.

27. The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table").  That table was the industry-standard table until 2001.  In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO mortality Table.  The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table and (b) mortality rates had improved significantly each year since the 1980 table issued.  The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted . . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.[3]

28. The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table."  This means the tables are showing a substantial improvement in

---

[3] *See* Report of the American Academy of Actuaries' Commissioner's Standard Ordinary (CSO) Task Force, Presented to the National Association of Insurance Commissioners' Life and Health Actuarial Task Force (LHATF), June 2001, *available at* http://www.actuary.org/pdf/life/cso2_june01.pdf.

9

mortality in a 20 year time period. These mortality improvements represent a substantial benefit that John Hancock should have passed on to policyholders. The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

29. The Society of Actuaries is currently investigating an update of the CSO tables with a current target publication date of 2017. An investigative report on the update of the CSO tables by the society was published in March 2015 and showed further significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements since 2001.

30. The 2001 CSO Mortality Table was generated from the 1990-95 Basic Mortality Tables published by the Society of Actuaries. The Society of Actuaries performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. Periodically the Society will publish an updated table to reflect the evolving industry experience. Major updates they have published over the last few decades include:

- 1975-1980 Basic Select And Ultimate Mortality Table
- 1985-90 Basic Select and Ultimate Mortality Tables
- 1990-95 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table
- 2015 Valuation Basic Table

31. The 1990-95 Basic Table reflected the death rates observed by 21 large life insurance companies (including John Hancock) with policy anniversaries between 1990 and 1995. This experience study is for data at, around, or immediately prior to the publication of the policy forms which are the subject of this complaint. The 2001, 2008 and 2015 Valuation Basic tables each show significant mortality improvements from the 1990-1995 Basic tables

demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently.

32.     John Hancock has repeatedly acknowledged that, consistent with industry experience, its mortality experience has been better than it expected.  For example, John Hancock's parent (Manulife Financial Corporation) made the following statement in its 2014 annual report, noting that recent mortality experience has been "favorable" when compared to its assumptions:

> Mortality relates to the occurrence of death. Mortality assumptions are based on our internal as well as industry past and emerging experience and are differentiated by sex, underwriting class, policy type and geographic market. We make assumptions about future mortality improvements using historical experience derived from population data. Reinsurance is used to offset some of our direct mortality exposure on in-force life insurance policies with the impact of the reinsurance directly reflected in our policy valuation.
>
> Actual mortality experience is monitored against these assumptions separately for each business. Where mortality rates are lower than assumed for life insurance, the result is favorable, and where mortality rates are higher than assumed for payout annuities, mortality results are favorable. ***Overall 2014 experience was favorable when compared with our assumptions***. Changes to future expected mortality assumptions in the policy liabilities in 2014 resulted in a decrease in net policy liabilities.

33.     The same conclusion of "favorable" mortality experiences compared to carrier assumptions is also documented in annual reports from 2013 and before.  In fact, between 2000 and 2013, there was only a single year – and that was in 2002 – in which Manulife reported that mortality experience was "consistent with the Company's assumptions." Manulife Financial Corporation reports on behalf of its subsidiaries, including John Hancock, and it "operat[es] under the John Hancock brand in the U.S."

34.     Despite this consistent trend of improving rates of mortality, John Hancock has never decreased the COI rates on COI Class Policies.

35. Moreover, John Hancock's COI rates include factors other than mortality, in violation of the plain language of the contract. As a result, John Hancock overcharged policyholders even if expectations of future mortality experience had never improved. This improper calculation of COI rates further damaged policyholders.

### C.  John Hancock's Unauthorized Age 100 Rider Overcharges

36. The second set of policies at issue are certain universal life policies issued by John Hancock that include an Age 100 Waiver of Charges Rider ("Age 100 Rider") that lists an Age 100 Waiver Monthly Rate by age. These policies include, at a minimum, the Doe Policy and all policies issued on the Age 100 Waiver of Charges Rider form used on the Doe Policy. These policies are referred to as "Rider Class Policies."

37. The relevant terms of all Rider Class Policies are substantively identical to those set forth in the Doe Policy. The policies at issue are all form policies, and insureds are not permitted to negotiate different terms. The Rider Class Policies are all contracts of adhesion that are drafted solely by John Hancock.

38. The Age 100 Rider that is included in all Rider Class Policies specifies that "[p]remium payments under the policy will no longer be accepted after the policy anniversary the date the younger Insured attains, or would have attained, age 100."

39. The Age 100 Rider further provides: "This Rider is made a part of the policy to which it is attached, in consideration of: (a) the application, a copy of which is attached to and made a part of the policy, and (b) payment of any additional premium required by us for this Rider."

40. These additional premiums are calculated in accordance with a table of rates included in the policy. This table explains that the "monthly cost of Insurance Charge for [the

Age 100 Rider] on a Pr[o]cessing Date equals the applicable Age 100 Waiver Monthly Rate times the Net Amount at Risk effective on that Processing Date."

41. The same table sets forth the Age 100 Waiver Monthly Rate, which varies according to the age of the insured. The policy defines age as follows: "On a policy anniversary, 'age' means the age of the younger Insured based upon his or her birthday nearest such anniversary."

42. The policy specifically provides that these additional premiums will only be charged on policies in which the underlying insured is 32 years old or younger. The policy does not provide for or permit John Hancock to charge any Age 100 Waiver Monthly Rate on policies in which the underlying insured is above 32 years old.

43. At all relevant times, the insureds on the Doe Policies have been older than age 32 under the definition of age set forth in the Age 100 Rider.

44. Despite the fact that no Age 100 Waiver Monthly Rate is applicable to the insureds, John Hancock has repeatedly charged plaintiff an additional premium under the Age 100 Rider.

45. Because these are form contracts, other similarly situated owners of Rider Class Policies have paid additional premiums under the Age 100 Rider, despite the fact that the relevant insureds do not have an applicable Age 100 Waiver Monthly Rate.

46. Charging policyholders these additional premiums violates the plain language of the Rider Class Policies. These additional premiums come directly out of policyholders' account value, and go straight into John Hancock's pocket.

**CLASS ACTION ALLEGATIONS**

47. This action is brought by plaintiff individually and on behalf of two classes pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure.

48. The first class – referred to herein as the "COI Decrease Class" – consists of:

All owners of "universal life" insurance policies issued by John Hancock Life Insurance Company (U.S.A.), or its predecessors, that contain the following language: "The Applied Monthly Rates will be based on our expectations of future mortality experience. They will be reviewed at least once every 5 Policy Years. Any change in Applied Monthly Rates will be made on a uniform basis for Insureds of the same sex, Issue Age, and Premium Class, including tobacco user status, and whose policies have been in force for the same length of time." The Class does not include defendant John Hancock, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

49. The second class – referred to herein as the "Rider Overcharge Class" – consists of:

All owners of universal life insurance policies issued by John Hancock Life Insurance Company (U.S.A.), or its predecessors, that contain an Age 100 Waiver of Charges Rider that lists Age 100 Waiver Monthly Rates by age. The Class does not include defendant John Hancock, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

50. The classes consist of hundreds of consumers of life insurance and are thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by John Hancock.

51. The claims asserted by plaintiff are typical of the claims of the COI Decrease Class and Rider Overcharge Class.

52. The plaintiff will fairly and adequately protect the interests of the classes and does not have any interests antagonistic to those of the other members of the classes.

53. Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters and COI matters, as well as class and complex litigation.

54. Plaintiff requests that the Court afford class members with notice and the right to opt-out of any classes certified in this action.

55. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the classes predominate over any individualized issues. Those common questions that predominate include:

(a) the construction and interpretation of the form insurance policies at issue in this litigation;

(b) whether John Hancock's actions in failing to decrease the cost of insurance charges imposed on the COI Decrease Class violated the terms of those form policies;

(c) whether John Hancock based its COI charges on factors other than expected mortality experience;

(d) whether John Hancock violated the terms of the form policies when it charged Rider Overcharge Class members additional premiums under the Age 100 Rider for insureds' older than the ages specified in the policies;

(e) whether John Hancock breached its contracts with plaintiff and members of the classes;

(f) whether John Hancock has experienced better mortality than it expected; and

(g) whether plaintiff and members of the classes are entitled to receive damages as a result of the unlawful conduct by defendants alleged herein and the methodology for calculating those damages.

56. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) the complexity of issues involved in this action and the expense of litigating the claims, means that few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b) when John Hancock's liability has been adjudicated, claims of all class members can be determined by the Court;

(c) this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d) without a class action, many class members would continue to suffer injury, and John Hancock's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e) this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract (on behalf of the COI Decrease Class)

57. Plaintiff realleges and incorporates herein the allegations of the paragraphs above of this complaint as if fully set forth herein. This claim is brought on behalf of plaintiff and the COI Decrease Class.

58. The subject policies are binding and enforceable contracts.

59. John Hancock breached the contract by deducting COI charges calculated from COI rates not based on expectations of future mortality experience. These overcharges include,

but are not limited to, the excess COI charges that John Hancock deducted by not reducing COI rates based on improved mortality.

60. John Hancock failure to decrease COI rates also violated the contracts' requirement that John Hancock review COI rates at least once every five policy years because any such review would have shown the need to decrease COI rates based on the improved mortality.

61. Plaintiff and the COI Decrease class have performed all of their obligations under the policies, except to the extent that their obligations have been excused by John Hancock's conduct as set forth herein.

62. As a direct and proximate cause of John Hancock's material breaches of the policies, plaintiff and the COI Decrease Class have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### Breach of Contract (on behalf of the Rider Overcharge Class)

63. Plaintiff realleges and incorporates herein the allegations of the paragraphs 1 through 56 above of this complaint as if fully set forth herein. This claim is brought on behalf of plaintiff and the Rider Overcharge Class.

64. The subject policies are binding and enforceable contracts.

65. John Hancock breached the policies by improperly charging additional premiums under the Age 100 Rider for insureds who are not the age they are required to be for any such additional premium charges to be authorized, as defined by the policies

17

66. Plaintiff and the Rider Overcharge class have performed all of their obligations under the policies, except to the extent that their obligations have been excused by John Hancock's conduct as set forth herein.

67. As a direct and proximate cause of John Hancock's material breaches of the policies, plaintiff and the Rider Overcharge Class have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff and the classes pray for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding plaintiff and the classes compensatory damages;

3. Awarding plaintiff and the classes pre-judgment and post-judgment interest, as well as attorney's fees and costs; and

4. Awarding plaintiff and the classes such other relief as this Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff and the classes hereby demand a trial by jury as to all issues so triable.

Dated: December 21, 2015

                                                  s/ Seth Ard
                                                  Seth Ard
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, NY  10022
Tel.:   212-336-8330
Fax:   212-336-8340
sard@susmangodfrey.com

Steven G. Sklaver (application for admission *pro hac vice* to be filed)
Frances Lewis
Glenn Bridgman (application for admission *pro hac vice* to be filed)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Tel:   310-789-3100
Fax:   310-789-3150
ssklaver@susmangodfrey.com
flewis@susmangodfrey.com
gbridgman@susmangodfrey.com

*Attorneys for Plaintiff and the proposed Classes*